LAFAYETTE-SOUTH SIDE BANK, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 4848, 7831. Promulgated September 7, 1927.

1. The evidence in these proceedings is insufficient to show that control existed on the part of the petitioner sufficient to warrant affiliation during the period of liquidation of two other corporations the assets of which had been partially taken over by the petitioner.

2. Where stock is specifically issued for tangible assets and by the same agreement good will is to be turned over to the same corporation without an issuance of stock or the payment of any other consideration therefor, the principle laid down in *St. Louis Screw Co.*, 2 B. T. A. 649, whereby an allocation of the stock between tangibles and intangibles was permitted, is not applicable.

3. Paid-in surplus on intangibles denied. *Herald-Despatch Co.*, 4 B. T. A. 1096.

*John E. McClure, Esq.*, and *Abraham Lowenhaupt, Esq.*, for the petitioner.

*Henry Ravenel, Esq.*, for the respondent.

The Commissioner determined deficiencies for 1919 and 1920 in the amounts of $158.97 and $8,983.68, respectively.

### FINDINGS OF FACT.

Prior to 1915, there were in existence two Missouri corporations known as the Lafayette Bank and the South Side Bank, which were carrying on a banking business in the City of St. Louis, Mo. The Lafayette Bank had an authorized capital of $200,000, all of which was issued and outstanding. The South Side Bank had an authorized capital of $500,000, all of which was issued and outstanding.

On January 14, 1915, the Lafayette Bank and the South Side Bank entered into the following agreement having for its purpose the formation of a new bank to be known as the Lafayette-South Side Bank:

AGREEMENT, entered into between the Lafayette Bank, party of the first part, and the South Side Bank of St. Louis, party of the second part:

WHEREAS, it is the desire of said parties that their business be transferred to a new banking corporation, to be known as the LAFAYETTE-SOUTH SIDE BANK OF ST. LOUIS, it is therefore agreed by and between the parties as follows:

#### I.

The parties agree to form, or cause to be formed, a new banking corporation, under the laws of Missouri, under the name of " Lafayette-South Side Bank of St. Louis," and the Bank shall be located in the City of St. Louis. The amount of the capital stock shall be Eight Hundred Thousand Dollars ($800,000), divided into eight thousand shares of the par value of one hundred dollars ($100) each, full paid and non-assessable, and the New Bank shall have a

surplus and undivided profits, as hereinafter stated. First party, through its nominees, shall subscribe for three thousand shares of the stock of the New Bank, and second party, through its nominees shall subscribe for five thousand shares. The Board of Directors shall consist of seventeen stockholders, and the following named shareholders shall constitute the board for the first year, viz:

| | |
|---|---|
| August A. Busch | Chas. F. Betz |
| Chas. Ehlermann | C. W. Johnson |
| Walter R. Medart | Hy. Menzenwerth |
| A. C. F. Meyer | George F. Moore |
| Joseph Pauly | Chas. Schroeter |
| Fred Widmann | B. G. Brinkman |
| Jos. A. Goettler | F. C. Hahn and |
| P. J. Pauly, Sr. | Henry Ziegenhein; |

the seventeenth director to be named later by a majority of the sixteen above named. But in case of the death, disability, absence or refusal of any of them to act, the remaining persons above named shall select a substitute or substitutes. The corporation shall continue for fifty years and shall have all the powers which such banking corporations now have or may hereafter be authorized by law to have. The said corporation is hereinafter referred to as the "New Bank"; and the contracting parties are referred to as the "old Banks."

The parties also agree to form, or cause to be formed, a realty company, under the laws of Missouri pertaining to manufacturing and business companies, Article VII, Chapter 33 of Revised Statutes of Missouri of 1909 and amendments thereto. The name of such corporation shall be "Lafayette-South Side Realty Company", or such other name shall be adopted for such realty corporation as the incorporators may deem proper. Said corporation shall be located in the City of St. Louis. The amount of its capital stock shall be $8,000.00 divided into eighty shares, of the par value of $100.00 each, full paid and non-assessable. First party, through its nominees, shall subscribe for thirty shares of the stock of the Realty Company and second party, through its nominees, shall subscribe for fifty shares. The Board of Directors shall consist of Seventeen shareholders and the following named shareholders shall constitute the board for the first year, viz:

| | |
|---|---|
| August A. Busch | Chas. F. Betz |
| Chas. Ehlermann | C. W. Johnson |
| Walter R. Medart | Hy. Menzenwerth |
| A. C. F. Meyer | George F. Moore. |
| Joseph Pauly | Chas. Schroeter |
| Fred Widmann | B. G. Brinkman |
| Jos. A. Goettler | F. C. Hahn and |
| P. J. Pauly, Sr. | Henry Ziegenhein; |

the seventeenth director to be named later by a majority of the sixteen named above. But in case of the death, disability, absence or refusal of any of them to act, the remaining persons above named shall select a substitute or substitutes. The corporation shall continue for fifty years and shall be formed for the purpose of acquiring a banking house site and erecting a banking house thereon for the New Bank, to be formed as in the foregoing paragraph provided, and with the general powers of a realty corporation incorporated under said laws. The site to be selected shall be determined by the Board of Directors of said Realty Company, and if by the Board deemed advisable, such site shall front on South Broadway, not further north than Carroll Street nor further south than Russell Avenue.

### III.

First party, for and in payment of the three thousand shares of the New Bank to be subscribed for by its nominees, shall pay to the said Lafayette-South Side Bank of St. Louis, at the time of its corporation, either in cash or other net assets of the character and value hereinafter defined, the sum of $468,000.00 over and above liabilities; and second party, for and in payment of the five thousand shares of the New Bank to be subscribed for by its nominees, shall pay to the said Lafayette-South Side Bank of St. Louis, at the time of its incorporation, either in cash or other net assets of the character and value hereinafter defined, the sum of $780,000.00, over and above liabilities; making, for the said Lafayette-South Side Bank of St. Louis, net assets of $1,248,000.00 and corresponding credits as follows:

| | |
|---|---:|
| Capital Stock | $800,000 |
| Surplus Fund | 400,000 |
| Undivided Profits | 48,000 |

The New Bank shall not be formed until the new banking house is ready for occupancy, and the transfer of assets in payment for subscriptions shall not be made until the incorporators are ready to execute the Articles of Incorporation of the New Bank; but the New Bank shall be formed within eighteen months from the date hereof (unless the completion of the building is unnecessarily retarded by strikes, accidents, or other causes beyond the control of the parties hereto), otherwise this agreement shall be void.

In lieu of all cash, or together with cash, in an amount sufficient to make up and pay for said subscriptions, either party may turn over such of its bank credits, bonds, stocks, real estate located in the City of St. Louis (but not elsewhere), real estate loans, mortgages, notes, bills of exchange, drafts or other securities, negotiable, or non-negotiable, lawfully held and owned by it, in its own right absolutely, at the date of such incorporation of the New Bank, including interest items accrued to that date, all of an actual and guaranteed value at date of incorporation of the New Bank, equal to the amount of cash in lieu of which such other assets are to be substituted. And the cash and other assets so to be turned over by the Lafayette Bank, the first party, must be $468,000.00 in excess of all its liabilities which the New Bank may agree to assume, and the amount of cash and other assets so to be turned over by the South Side Bank of St. Louis, the second party, must be $780,000.00 in excess of all its liabilities which the New Bank may agree to assume.

First party shall appoint a committee of two to represent it, and second party shall appoint a committee of two to represent it, and either party has power from time to time to substitute other members of the committee in lieu of those first appointed. The two committees shall constitute a joint committee, and from and after the date when this agreement is ratified by two-thirds of the stockholders of each Bank, and until the turning over of the assets of the New Bank, the joint committee and each of the members thereof shall have free access to enter the premises of the parties hereto and examine all books, papers, accounts and other assets of every kind and character to the parties belonging, and all collateral and other securities held by the parties and all reports pertaining to the credit of customers, and all reports of the Bank Commissioner or Examiners of the State Banking Department and of the St. Louis Clearing House Association or its Examiners. And the members of the joint committee shall, at about the date of the incorporation of the New Bank, and as of that date, determine the assets and the fair market value of all assets so to be turned over in lieu of cash, and no assets which, in the opinion of any one of the four members of the joint committee, are not fully worth the book value

thereof as carried on the books of the Bank shall be taken over by the New Bank, except at a value unanimously agreed upon by the members of the joint committee. But if any asset thus questioned is one which, from the standpoint of prudent banking, ought to be acquired by the New Bank and is claimed to be of a value greater than book value, and the four members of the joint committee cannot agree upon such value, then the Chief Examiner of the St. Louis Clearing House Ass'n. shall determine whether the New Bank ought to take over such assets and at what value, and his decision shall be final and conclusive upon all parties and thereupon the same shall be taken over by the New Bank at the valuation so determined by him, provided the party owning such asset is willing to turn it over at that value, otherwise the same shall not be turned over to the New Bank.

In the event the Chief Examiner of the St. Louis Clearing House Association should refuse to perform the duties required of him under this or under any other paragraph of this agreement, then the President of the St. Louis Clearing House Association shall designate some one else to act in the place and stead of the Chief Examiner, and the person so appointed by him shall have all the powers herein entrusted to the said Chief Examiner.

Except as in this agreement otherwise provided, either old Bank may reserve to itself any asset belonging to it which its committee does not wish to turn over to the New Bank at book value or at the value fixed by the said Chief Examiner, but in that event cash is to be put in, in lieu of the assets so reserved.

It is further understood that if the assets of one of the old Banks as unanimously accepted and approved by the joint committee amount to more than the amount which such old Bank is required to pay or turn over to the New Bank as hereinbefore provided, then such old Bank may select from the assets thus approved such of them as it may desire to turn over to the New Bank, thus giving the old Bank the choice of determining the assets to be contributed as its share of the Capital, Surplus and Undivided Profits and Contingent Fund and to be so paid in and delivered by said Bank to the New Bank.

IV.

In addition to the cash and other assets to be assigned to the New Bank, as hereinbefore provided, said Lafayette Bank and said South Side Bank of St. Louis shall each also assign and turn over to the New Bank cash and other assets (and in case assets other than cash are transferred, and same are to be approved, valued and accepted in the manner hereinbefore provided) of the value of one hundred thousand dollars ($100,000.00), in the case of each Bank, as a Guarantee Fund to cover any and all losses, bad debts, discrepancies and shortages subsequently appearing with reference to assets conveyed by said respective Banks to said New Bank.

One of said funds of $100,000.00 shall be credited on the books of said New Bank to an account to be called " Special Reserve Fund No. 1, for Contingent Losses, Lafayette Bank Assets"; and the other fund of $100,000.00 shall be credited in a similar manner to an account to be called " Special Reserve Fund No. 2, for Contingent Losses, South Side Bank of St. Louis Assets." Each of said Special Reserve Funds shall be credited annually with interest at the rate of five per cent per annum upon the average balance to the credit of said fund during the preceding year, and such interest shall be added to the Guarantee Fund. Any loss, bad debt, discrepancy or shortage, accruing or discovered within three years from the date of the incorporation of said New Bank, with respect to any assets assigned or conveyed to said New Bank by said Lafayette Bank (or any renewals or extensions thereof as hereinafter provided), shall

be charged to said Special Reserve Fund No. 1, whenever so directed by the Board of Directors of the New Bank, and any loss, bad debt, discrepancy or shortage accruing or discovered within three years from the date of the incorporation of said New Bank with respect to any assets assigned or conveyed to said New Bank by said South Side Bank of St. Louis (or any extensions or renewals thereof as hereinafter provided), shall be charged to said Special Reserve Fund No. 2, whenever so directed by the Board of Directors of the New Bank.

Said Special Reserve Fund shall remain on deposit as Guarantee Funds as aforesaid for three years from and after the date of incorporation of the New Bank, and during said period the New Bank shall not permit either of the parties, or anyone claiming through or under them, to withdraw the said funds or any part thereof, nor the interest thereon, except by credits against the same when arising as aforesaid. But at the end of said period of three years the amount remaining to the credit of said Special Reserve Fund No. 1 (after further reducing the same by losses, bad debts, discrepancies or shortages, actual or contingent, for which said Lafayette Bank may then be liable), shall be paid to the said Lafayette Bank or to its order or assigns. And at the end of said period of three years the amount remaining to the credit of said Special Reserve Fund No. 2 (after further reducing the same by losses, bad debts, discrepancies, or shortages, actual or contingent, for which said South Side Bank of St. Louis may then be liable), shall be paid to the said South Side Bank of St. Louis or to its order or assigns. Amounts then retained to cover contingent liabilities or losses of the old Banks shall bear interest at the same rate and in the same manner as above provided, but the same shall be paid over to the old Banks respectively entitled to the same whenever the contingent liability has been satisfied, released or defeated. But no deduction shall be made from the Special Reserve Fund of either Bank for " contingent " liabilities, at the end of said three years, unless such contingent liabilities are then in litigation.

Real estate, bonds, stocks, debentures and other securities of that nature assigned or conveyed to the New Bank are to be guaranteed to the New Bank, by the Bank transferring the same, to be at the date of transfer of the value then agreed upon, and all loss, if any, in value thereafter, shall be borne by the new Bank and all appreciation in value shall belong to the New Bank; but losses thereafter, occasioned because of any defect in title, shall be guaranteed to the New Bank and made good by the old Bank.

Real estate loans, mortgages, notes, bills of exchange, special tax bills, drafts or overdrafts are to be guaranteed to the New Bank to be of the value at which the same are to be taken over, and if any losses actually occur thereafter within three years from the date of the incorporation of the New Bank in the collection of any of such assets (or renewals or extensions thereof as hereinafter provided), such losses are to be borne by the Bank which transferred the same, and said Bank guarantees the New Bank against any such loss. Losses occurring after said three year period shall be borne by the New Bank. Assets charged off against the Special Reserve Fund shall be turned over to the Bank which transferred the same to the New Bank, at date of such charging off. The deposit of such Special Reserve Fund as such collateral guaranty shall not be deemed as a release of the old Bank from liability on its guaranty with respect to any loss or losses, occurring within the three year period, in excess of such Special Reserve Fund.

No renewal or extension, however, shall be granted by the New Bank except at the risk of the New Bank, unless the old Bank which transferred such asset to the New Bank requests such renewal or extension, and if any actual

loss occurs within the three-year period, with respect to renewal paper renewed at the request of either old Bank, the loss shall be borne by the old Bank, but if such loss occurs thereafter the loss shall be borne by the New Bank.

## V.

If, at the date of the valuation of the assets of the respective Banks, preliminary to the incorporation of the New Bank, it appears that either Bank will not be able to turn over to the New Bank, in cash or other acceptable assets, the amount hereinbefore agreed to be put by it (the Lafayette Bank $468,000.00 and $100,000.00 Special Reserve Fund, and the South Side Bank of St. Louis $780,000.00 and $100,000.00 Special Reserve Fund), then the other Bank may correspondingly reduce the payment to be made by it for account of capital stock, surplus and undivided profits; that is to say, on the basis hereinbefore provided each party was to pay in, for capital stock, surplus and undivided profits, the sum of $156.00 per share for the shares subscribed for it, and therefore if the amount in cash and other assets which can only be so contributed by either party be less than $156.00 per share, the amount to be paid in per share by the other party shall be similarly reduced.

## VI.

From the date of the incorporation of the New Bank, and when it has been authorized by the Bank Commissioner to engage in business, the parties hereto agree to turn over to the New Bank the good-will of their banking businesses and the customers thereof, so far as the New Bank may desire them; and to enable the New Bank to become fully possessed of such good-will and forever afterwards to enjoy the same, the parties hereto agree that they will not, at any time thereafter, engage in any branch of the banking or safe-deposit business, except to liquidate their remaining assets and distribute them to their stockholders, and they agree to wind up their affairs and to procure a dissolution of their charters whenever their affairs have been wound up, and not later than five years from the incorporation of the New Bank. The parties also agree that they will take steps, at the time of the incorporation of the New Bank or thereafter, to change their corporate names so that they will not have a corporate name similar in any respect to the name of the New Bank; but unless such change of corporate name be required by the State Bank Commissioner, the contracting parties shall not change their corporate names prior to the incorporation of the New Bank, nor shall they change their corporate names after the incorporation of the New Bank except at the request of the New Bank; and neither of the contracting parties shall be requested by the New Bank to change its corporate name unless the New Bank makes such request of both the contracting parties.

After the incorporation of the New Bank, all mail matter, telegrams, etc., addressed to either of the old Banks, shall be turned over to the New Bank in the first instance; and if the same pertain to matters in which the New Bank is in no wise interested, then such communication shall be turned over to the old Bank to whom they were addressed; it being the intention of this agreement that the New Bank shall succeed to all the business of the old Banks, although receiving only assets to the extent hereinbefore provided, and it being distinctly understood that the New Bank is to assume none of the liabilities of the old Banks, except those herein expressly assumed by the New Bank.

It is also expressly understood that the offices of the old Banks, until fully liquidated and dissolved, shall be kept in the banking rooms of the New Bank, in such space as may be allotted to them by the New Bank, but no rent shall be charged to the old Banks, nor shall they be compelled to pay the New Bank any other compensation growing out of the keeping of their offices in the banking rooms of the New Bank, nor for clerical services, if any are furnished by the New Bank in assisting the old Banks in the liquidation of their affairs. The New Bank, may, however, permit or require the old Banks to withdraw their offices to some other location. While the offices of the old Banks are maintained at the banking rooms of the New Bank, neither of the old Banks shall be permitted to put up any sign on the building to indicate that it is located at said premises, and the officers, directors and stockholders of the old Banks shall have access to the premises only during such reasonable business hours as the New Bank may direct.

### VII.

The present leasehold, held by the South Side Bank of St. Louis, on its banking house, northwest corner of Broadway and Pestalozzi Street, expiring May 1, 1915, and which is to be renewed for five years, shall be assigned to the New Bank, but the same shall not be valued as an asset of any value; the New Bank shall assume all the covenants on the part of the lessee and shall hold the lessee harmless therefrom.

The New Bank is not to acquire the office, banking or safe deposit fixtures of either old Bank, except as may hereafter be mutually agreed upon, nor is any valuation to be placed on " good-will," " business " or " going value " of either Bank, nor on its books of account, card system, or stationery. The books of account, card systems, etc. in so far as they pertain to assets transferred to the New Bank, shall be turned over to the New Bank, but no value shall be placed thereon.

The amount invested by each of the old Banks, in the stock of the Realty Company above referred to, or in loans or advances to said Realty Company, shall be accepted at its cost or face value by the New Bank, plus accrued interest at five per cent, and the joint committee shall have no power to place a higher or lower value on such investments.

The present site of the Lafayette Bank at Broadway and Park Avenues, shall be taken over by the New Bank at a valuation of $20,000.00, for the fee simple title, free from liens or encumbrances.

### VIII.

Except as herein otherwise provided, the New Bank shall not assume any liabilities whatsoever of either of the old Banks, except as follows: The New Bank is to assume liability for such current deposits, savings deposits, special deposits, cashier's checks, certified checks, certificates of deposit, drafts or other bills of exchange, re-discounts, overdrafts, acceptances and accrued interest owing by each old Bank, as are shown on its books and statement of assets and liabilities at date of transfer but for none others; and, as already stated, the assets to be contributed by the Lafayette Bank shall exceed all its said liabilities by $468,000.00, in addition to which it is to put up the Special Reserve Fund of $100,000.00, and the assets to be contributed by the South Side Bank of St. Louis shall exceed all its liabilities by $780,000.00, in addition to which it is to put up the Special Reserve Fund of $100,000.00.

## IX.

It is further understood that the shares of stock of the New Bank which each of the old Banks is to get, are to be immediately turned over by it, under appropriate resolutions to be adopted by its Board of Directors and stockholders, to its lawful stockholders, authorizing or ratifying this agreement, on the basis hereinafter mentioned, and such stock as non-assenting stockholders refuse to take, shall be sold by the old Bank and the proceeds shall be held by it as a fund to satisfy the claims of such non-assenting stockholders. The capital stock of the Lafayette Bank being $200,000.00 its stockholders shall receive one and one-half shares of stock of the New Bank in partial liquidation on account of each one share of Lafayette Bank stock. The capital stock of the South Side Bank of St. Louis being $500,000.00, its stockholders shall receive one share of stock of the New Bank in partial liquidation on account of each one share of South Side Bank of St. Louis stock.

## X.

If the New Bank should be required to defend any action, whether at law or in equity, which may be brought against it, by any minority stockholder of one of the old Banks, or by any person claiming to have been wrongfully deprived of his rights as a stockholder, and who refused to authorize or ratify this agreement, any judgment which may be recovered against the New Bank, together with the expenses incurred by it in defending such action, shall be refunded to it by the Bank of which such litigant was or claimed to be a stockholder, and the amount thereof may be deducted by the New Bank from the Special Reserve Fund of such old Bank.

If the aggregate number of shares held by non-assenting shareholders of either old Bank, amounts to more than fifty shares in number, the old Bank shall be required to put up with such New Bank, at date of incorporation, such additional separate collateral security as will be sufficient to protect the New Bank against any liability to such non-assenting shareholders.

## XI.

The New Bank shall cause the following officers to be elected:

| | |
|---|---|
| August A. Busch | President |
| A. C. F. Meyer | First Vice-President |
| B. G. Brinkman | Second Vice-President. |
| F. C. Hahn | Cashier |
| Otto J. Gossrau | Assistant Cashier |
| B. J. Bloemker | Assistant Cashier |

In the event of the death, disability or refusal to act, of any of the said officers, the Board of Directors of the New Bank, shall fill such office.

All legal matters pertaining to the carrying out of this agreement, the organization of the New Bank and the transfer of the business and assets of the old Banks to the New Bank, shall be referred to the law firm of Schnurmacher & Rassieur, and their fees for services in this connection shall be borne by the New Bank; but services rendered for either of the old Banks in connection with their other affairs, or in connection with their liquidation and dissolution, shall be paid for by the Bank employing them. Any matter of dispute arising under this agreement, with respect to the true and correct interpretation of any of its terms, shall be referred to said attorneys, whose decision thereon shall be final and conclusive as to all parties.

## XII.

This agreement shall not become binding on either party, unless, on or before March 1, 1915, at least two-thirds of the stockholders of each of the old Banks have in writing approved and ratified this agreement; nor if, in any proceeding, either Bank is permanently enjoined from carrying out this agreement; nor if the State Banks Commissioner refuses to permit the old Banks, or either of them, to make such transfers or refuses to permit the New Bank to commence business.

The foregoing agreement was ratified by all of the stockholders of the Lafayette Bank by the following trust agreement entered into on January 14, 1915:

AGREEMENT, entered into between the undersigned, who are stockholders of the Lafayette Bank, as parties of the first part, P. J. Pauly, Sr., B. G. Brinkman, and F. C. Hahn, Trustees, as parties of the second part, and said Lafayette Bank as party of the third part, WITNESSETH:

1. First parties agree to assign and deliver their certificates of stock (representing the number of shares of said Bank hereinafter set opposite their names), to said Trustees, who shall cause the same to be transferred on the books of the corporation and canceled, and new certificates for said shares shall be issued in the names of the Trustees. Such shares shall be held by the Trustees upon the trusts hereinafter mentioned, but they may cause certificates for two shares each to be issued to such persons as they may select, to qualify them as directors of said Lafayette Bank.

The Trustees shall issue to each subscriber a trust certificate or certificates for the shares deposited by him, which certificate shall be substantially in the following form:

### TRUST CERTIFICATE

No. _____          St. Louis, Mo. _____, 191__

The undersigned Trustees hereby certify that they hold in trust for _____ shares of the capital stock of the Lafayette Bank, upon the trusts set forth in a certain agreement, dated January 14, 1915, entered into between certain stockholders of said Bank, the undersigned as Trustees and the said Bank. Attached to said agreement and therein referred to, is an agreement, entered into between the Lafayette Bank and the South Side Bank of St. Louis, providing for the amalgamation of said banks and the formation of a New Bank, under the name of Lafayette-South Side Bank of St. Louis.

In the event of the formation of the Lafayette-South Side Bank of St. Louis, as in said agreement provided, the holder hereof will be entitled to one and one-half shares of the stock of said New Bank for each one share of the stock of said Lafayette Bank now held in trust for him, and to his pro rata of the amounts paid out by the said Lafayette Bank in liquidation. Dividends which may be paid by the said Lafayette Bank prior to the incorporation of the New Bank shall, as and when the same are collected by the Trustees, be paid by them to the trust certificate-holders, registered on the trust certificate books of the Trustees. No other distribution will be made to certificate-holders except upon the presentation of the certificate by the holder for endorsement thereon of the amount to be distributed. The shares deposited in trust will be returned to the holder hereof or his transferee in the event such New Bank is not formed within the time fixed in said agreement, or in the event of the rescission of said agreement for the amalgamation of said Banks, but only upon surrender of this certificate, properly endorsed.

This certificate is negotiable, but the Trustees will not be required to recognize the validity of any transfer hereof unless in writing endorsed hereon, and then only upon surrender of this certificate, properly endorsed, whereupon this certificate will be cancelled and a new trust certificate will be issued to the transferee.

_____ shares

_____
_____
_____
                                        *Trustees.*

(Endorsement:)

(Assignment)

I hereby assign to _____ my rights in _____ shares of the shares of the Lafayette Bank referred to in the within trust certificate and my rights to that extent, as beneficiary of the trust; and I authorize the Trustees to cancel this certificate and to issue new trust certificates in lieu thereof.

_____, 191__

                                        _____

Witness:

_____

2. In case of the transfer of any trust certificate, the transferee, by the acceptance of such transfer, accepts the provisions of the trust agreement and becomes bound thereby, the same as if he had signed the agreement as one of the parties of the first part.

3. The parties of the first part hereby give their full consent to the transfer by the Lafayette Bank to the proposed New Bank, the Lafayette-South Side Bank of St. Louis, of all its assets, or so much thereof as may be required under the provisions of the agreement entered into between the Lafayette Bank and the South Side Bank of St. Louis, bearing even date herewith, a copy of which agreement is hereto attached. And the parties of the first part, for themselves and their assigns, hereby ratify the action of the Lafayette Bank in entering into said agreement; and they authorize the trustees to vote said stock in favor of any resolution necessary to ratify the said agreement or to carry it out.

4. When such sale of the business and assets of the Lafayette Bank is made and the certificates of stock of the New Bank are issued to the Trustees, the Trustees shall cause to be issued to each of the parties of the first part certificates for one and one-half shares of the New Bank on account of each one share of the Lafayette Bank, contributed by him and transferred to the Trustees, all as in said agreement for the amalgamation of the two Banks provided.

5. If such New Bank is formed, as in said agreement provided, the Lafayette Bank shall thereafter cause its remaining assets to be liquidated and reduced to cash as speedily as practicable, and shall make distribution thereof to its stockholders; and the Lafayette Bank shall sell any and all assets not otherwise collectible, in order to secure the cash required for distribution purposes. When and as the Trustees receive such distribution from the old Banks, they, the Trustees, shall likewise make distribution thereof among the trust certificate holders, according to their respective interests, without priority or preference to any of them. Dividends which may be paid by the old Bank, prior to the incorporation of the New Bank, shall, as and when the same are collected by the Trustees, be paid by them (or by the Bank for the account of the Trustees), to the trust certificate holders registered on the trust-certificate books of the Trustees.

6. Upon the final distribution of all assets of said Lafayette Bank, the Trustees shall cause the said corporation to be dissolved and the certificates of stock, held by the Trustees to be cancelled.

7. In case of the death of any of the Trustees, or in case of the resignation of any of them, the holders of a majority in amount of outstanding trust certificates may, by instrument in writing, appoint a new Trustee to fill the vacancy. Until such appointment is made, the remaining Trustee shall have full power to act. And upon any and all matters, a majority of the Trustees shall have full power to act. The Trustees may choose one of their number as Secretary and he shall thereupon be authorized, in behalf of the Trustees, to sign their names to trust certificates and to issue them with the same effect as if signed by all the Trustees in person. Checks may also be issued and signed by the Secretary in the names and behalf of all the Trustees. The Trustees shall keep a record of all trust certificates issued by them, of the names of all trust certificate holders, of all transfers, and of all their receipts and disbursements.

8. In the event the New Bank, Lafayette-South Side Bank of St. Louis, is not formed, and the agreement between the two Banks is not carried out, then the shares of the Lafayette Bank contributed by the subscribers shall be returned by the Trustees to the then lawful holders of the outstanding trust certificates upon the surrender of such trust certificates.

9. The pro rata assets of the Lafayette Bank which may be due to non-assenting stockholders, shall be held by the corporation for them, and all damages or other sums which the corporation may be required to pay to non-assenting stockholders, including costs and expenses of litigation, shall be paid by the corporation out of undistributed assets, and all damages or other sums which the said Trustees may be required to pay to non-assenting stockholders, including costs and expenses of litigation, shall be paid by the Trustees out of undistributed assets coming into their hands as such Trustees.

10. There are five counterparts of this agreement and the signatures to all of them shall be counted the same as if all were signed to one copy. This instrument shall be void unless subscribed by at least two-thirds of all the stockholders of the Lafayette Bank, and unless the shares so subscribed are accordingly transferred and surrendered to the Trustees on or before March 1, 1915; but the Trustees are authorized and directed to continue to take subscriptions thereafter, and all stockholders thereafter subscribing and contributing their stock shall be regarded the same as stockholders who subscribe before March 1, 1915. If the necessary two-thirds of the stock has not been subscribed and transferred to the Trustees on or before March 1, 1915, as in this agreement provided, or if, on or before said date, the necessary two-thirds of the stock of the South Side Bank of St. Louis has not been transferred to Trustees under a certain trust agreement, providing for the ratification by the stockholders of said Bank of the agreement between the two Banks for their amalgamation or if the said agreement for the amalgamation of the two Banks be rescinded by either of the parties as in said agreement provided, then the shares transferred to the Trustees under this agreement shall be returned forthwith to the trust certificate-holders or their assigns, upon surrender of the outstanding trust certificates.

On the same date, January 14, 1915, the stockholders of the South Side Bank, parties of the first part, August A. Busch, A. C. F. Meyer and Henry Menzenwerth, trustees, parties of the second part, and the South Side Bank, party of the third part, entered into a trust

agreement similar to the foregoing trust agreement entered into by the Lafayette Bank and its stockholders and the trustees.

The terms of the three agreements hereinbefore referred to were carried out. The stockholders of the two old banks transferred their stock in the respective old banks to the trustees named in the respective agreements in exchange for negotiable trust certificates issued, and authorized the said trustees to vote said stock so transferred in any way necessary to ratify and carry out the aforesaid agreement relating to the formation of the New Bank known as the Lafayette-South Side Bank.

The petitioner, the Lafayette-South Side Bank, was formed in 1916 in accordance with the agreement hereinbefore referred to. At the date of incorporation, the petitioner issued 8,000 shares of capital stock, par value $100, for certain of the assets of the Lafayette Bank and the South Side Bank, 3,000 shares being issued for assets of the Lafayette Bank and 5,000 for assets of the South Side Bank. The tangible assets conveyed by the Lafayette Bank had a value of $468,000 and those of the South Side Bank a value of $780,000, or a total value of tangible assets of $1,248,000.

Thereafter the Lafayette Bank and the South Side Bank continued in existence for the purpose of liquidating their assets and for such other purposes as might be necessary to a furtherance of the consolidation agreement between the two banks, but did not engage in the banking business.

The earnings of the Lafayette Bank from 1911 to 1915, inclusive, were as follows:

| | |
|---|---|
| 1911 | $54,038.12 |
| 1912 | 29,671.80 |
| 1913 | 60,571.10 |
| 1914 | 88,393.04 |
| 1915 | 80,428.63 |

Net tangibles of the Lafayette Bank for the same period were:

| | |
|---|---|
| 1911 | $1,085,691.89 |
| 1912 | 1,106,651.20 |
| 1913 | 1,104,600.06 |
| 1914 | 1,128,674.24 |
| 1915 | 1,137,067.28 |

The earnings of the South Side Bank from 1911 to 1914, inclusive, were:

| | |
|---|---|
| 1911 | $52,405.90 |
| 1912 | 60,868.86 |
| 1913 | 67,802.68 |
| 1914 | 93,064.60 |

Net tangibles of the South Side Bank during the same period were:

| | |
|---|---|
| 1911 | $473,616.92 |
| 1912 | 502,335.79 |
| 1913 | 635,389.89 |
| 1914 | 787,735.73 |

The bid price of the stock of the Lafayette Bank immediately prior to the formation of the petitioner in 1916 was $650 per share and that of the South Side Bank $240 per share. Few, if any, sales were made at the bid prices or any other price. The bid price of the Lafayette-South Side Bank stock was $260 shortly after this bank was formed and increased during 1916 to $288.

The South Side Bank was known as a Busch bank from the fact that it was sponsored by the Anheuser-Busch Brewing Co., which had a large plant in the vicinity of the bank. August A. Busch was its president. The Lafayette Bank was known as a conservative German bank.

During 1919 and 1920 the members of the two groups of aforementioned trustees together owned less than 50 per cent of the stock of the petitioner. Only one stockholder, Joseph Goettler, owned stock in the three corporations during 1919 and 1920, his holdings being: Lafayette Bank, 126 shares; South Side Bank, 2 shares; and Lafayette-South Side Bank, 125 shares.

OPINION.

LITTLETON : Three issues are raised in these proceedings as follows:

1. Were the Lafayette Bank and the South Side Bank affiliated with the petitioner for 1919 and 1920?

2. Did the petitioner acquire intangible assets by the issuance of capital stock therefor at date of organization, and if so, what was its value at the date of such acquisition?

3. In the event the Board should hold that the petitioner did not acquire intangible assets by the issuance of capital stock therefor, is the petitioner entitled to a paid-in surplus on account of intangibles paid in as a result of its formation?

Affiliation is claimed under the provisions of section 240 (b), Revenue Act of 1918, which reads as follows:

For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.

There is no contention advanced in these proceedings that there was a common ownership by the same stockholders in the three corporations sufficient to justify affiliation under the foregoing provisions; in fact, the evidence presented shows only one stockholder

common to the three corporations and his holdings were negligible as compared with the total stock outstanding. Likewise, it is not contended or shown that any one of the corporations owned stock in either of the other corporations. In effect, the claim advanced is that substantially all of the capital stock of the Lafayette Bank and the South Side Bank was controlled by the Lafayette-South Side Bank and that the parties owned its stock in such a manner as to satisfy the control contemplated by section 240 (b). This control, the petitioner says, was brought about through the amalgamation agreement of the two old banks and the trust agreements executed in connection therewith.

When the foregoing agreements were executed and carried into effect, the stockholders of the Lafayette Bank had a right to receive 37½ per cent of the stock of the petitioner and the stockholders of the South Side Bank 62½ per cent.

Prior to the formation of the petitioner bank, the stockholders of the Lafayette Bank assigned and delivered their stock to a group of trustees who caused the same to be canceled and new stock issued in the name of the trustees. The trustees then issued trust certificates to the old stockholders in lieu of the stock formerly held by them. Upon the formation of the petitioner bank, its stock, which would otherwise have been issued to the old stockholders of the Lafayette Bank, was issued to the aforementioned trustees, who in turn caused stock certificates to be issued to the appropriate old stockholders.

A similar method was pursued in the case of the South Side Bank, trustees being selected who functioned in a like manner to those selected in the case of the Lafayette Bank. In each case authority was given each group of trustees, under the trust agreements, to vote the stock of the old banks "in favor of any resolution necessary to ratify said agreement or to carry it out." Trustees testified at the hearing that they could vote this stock only in accordance with the authority outlined in the trust agreements.

The question is whether through the medium of the two groups of trustees, acting in conformity with their respective trust agreements and through the amalgamation agreement control existed necessary to bring about affiliation of the three companies.

In the *Appeal of Isse Koch & Co.*, 1 B. T. A. 624, the Board defined "control" as follows:

There is no authority in the section of law referred to or in its context so far as we can see, for assuming that Congress intended to use the word "control" in other than its ordinary and accepted sense. On the other hand, we believe that a proper construction of the statute, if it is to serve the purpose for which it was intended, requires us to hold that the "control" mentioned therein means actual control, regardless of whether or not it is based upon legally enforceable means. The control, however, must be shown to be a

genuine and real control actually exercised, and it can not be established by mere assertions or agreements between majority and minority stockholders unsupported by facts. Potential control of stock is not sufficient in itself to justify consolidation.

Further, the Board said in *Appeal of Canyon Lumber Co.*, 1 B. T. A. 473, that:

The control, however, referred to in the statute, whether it be legal or otherwise, means control of the voting rights of stock.

We must, therefore, determine whether there was real control, actually exercised, of substantially all the voting rights of the stock of the Lafayette and South Side Banks by the Lafayette-South Side Bank. First, we find that in the trust agreement under which new stock was to be issued to the trustees, authority was given to the trustees to vote the stock for certain purposes, namely, in favor of any resolution necessary to ratify said agreement or to carry it out, and there is no evidence of unlimited authority vested in the trustees to vote the stock for any and all purposes. The old banks were to continue in existence for a certain period during which various acts must necessarily be performed incident to liquidation and disposal of their assets. The interest of the petitioner in the acts effecting the liquidation was that the terms of the so-called amalgamation or merger agreement be carried out—particularly, that nothing be done in liquidation that would be to the detriment of the new bank, and that the " going-concern " value of the old banks be effectually transferred to the petitioner in so far as it was desired by the petitioner. To this extent, the trust agreements provide a means by which control is maintained by the trustees over the voting rights of the stock, but this is very far from saying that there was a genuine control for all purposes. Conceivably, many acts might have been necessary in connection with the liquidation of the old companies which did not affect the agreement which gave rise to the new bank, and, as to these, we have no evidence that the trustees had any right to vote the stock as trustees, and hence no control to this extent.

Secondly, the express words and tenor of the agreement are to the effect that the petitioner desired only certain assets of the old banks and great care was exercised in seeing to it that only approved assets came to the petitioner. Special guarantee funds were provided to protect the petitioner against certain contingent losses and also that losses occurring during the first three years on account of certain assets should be borne by the old banks. In other words, there is abundant evidence that the petitioner was to acquire certain assets and that that part of the business which it did not desire was to remain separate and distinct from the petitioner. What the petitioner did not take over remained as the property of the old banks to be disposed of by them. Losses suffered would be chargeable to

the old banks and any gains realized would accrue to them, not to the petitioner.

Thirdly, the trustees did not in their individual capacities together own a controlling interest of petitioner's stock. The amalgamation agreement provided who should be officers and directors of the petitioner and the two groups of trustees were selected from the directors so named. The trustees under the trust agreement with the stockholders of the Lafayette Bank were old stockholders of the Lafayette Bank and similarly the other group of trustees were old stockholders of the South Side Bank. But from these facts we can not say that the acts of the trustees would be acts of the petitioner and that the control given to the trustees would be control by the petitioner of the two old banks.

The trust certificates, which were issued by the trustees to the stockholders of the old banks in lieu of the stock of the old banks formerly held by them, were not introduced in evidence and no information was submitted to show the provisions contained therein other than that which may be gathered from the trust agreements themselves. Whether there were any rights reserved therein under which the holders thereof could function with respect to the remaining assets of the old banks, we are not informed. The trust agreements show limited authority vested in the trustees to vote the stock of the old banks issued to them. Apparently the remaining authority rested during the period of liquidation, in the stockholders of the old banks. Since the stockholders, prior to the execution of the trust agreement, had authority to vote their stock as owners of the same and if only a part of such right of control was granted to the trustees, it would seem reasonable to assume that at least a partial control yet remained in the old stockholders.

From a consideration of the entire evidence, we fail to find that control existed in the petitioner or its stockholders over the voting rights of the stock of the old banks which we consider necessary for affiliation. Undoubtedly, there was a certain degree of control exercised by the petitioner over the old banks during their period of liquidation and that, through the amalgamation agreement, restrictions were placed on the exercise of certain functions by the old banks. This however, is far from saying that control existed which would result in affiliation as contemplated by the statute. Even though corporation A, through an agreement which it has with the stockholders of corporation B, may be able to dictate certain policies of corporation B, control could not be said to exist to any greater extent than that evidenced by the agreement itself. In order to bring about an affiliation, control must exist for all practical purposes—not merely for certain limited purposes.

The next question is whether intangible assets were acquired by the petitioner through the issuance of capital stock therefor at the date of incorporation. At the outset, it should be noted that the question is not whether the petitioner acquired good will heretofore possessed by the two old banks, but rather, whether stock was specifically issued for the good will. The evidence is clear that the petitioner was to receive and did receive certain good will of the old banks. This is admitted by the Commissioner in the brief which he filed. The point contended for by the petitioner is that stock was issued both for tangible and intangible assets, and that in the determination of its invested capital, its capital stock as issued at organization should be apportioned between the tangible and intangible assets upon the basis of their valuation at that time.

When it was proposed to form the petitioner, an agreement was entered into between the two old banks as to the assets which were to be transferred, the method of determining the value of the assets and other features incidental to the acquisition of the assets of the old banks by the petitioner, and the formation of the petitioner. All of this was set out in detail and with great particularity.

Among the provisions of the aforementioned agreement we find the following:

First party, *for and in payment of the three thousand shares of the New Bank* to be subscribed for by its nominees, *shall pay* to the said Lafayette-South Side Bank of St. Louis, at the time of its corporation, *either in cash or other net assets* of the character and value hereinafter defined, the sum of $468,000.00 over and above liabilities; and second party, *for and in payment of the five thousand shares of the New Bank* to be subscribed for by its nominees, *shall pay* to the said Lafayette-South Side Bank of St. Louis, at the time of its incorporation, *either in cash or other net assets* [italics ours] of the character and value hereinafter defined, the sum of $780,000.00, over and above liabilities; making, for the said Lafayette-South Side Bank of St. Louis, net assets of $1,248,000.00 and corresponding credits as follows:

| | |
|---|---|
| Capital Stock | $800,000.00 |
| Surplus Fund | 400,000.00 |
| Undivided Profits | 48,000.00 |

Then follows this description of the " other net assets " which would be acceptable in lieu of cash in payment for the stock:

In lieu of all cash, or together with cash, in an amount sufficient to make up and pay for said subscriptions, either party may turn over such of its bank credits, bonds, stocks, real estate located in the City of St. Louis (but not elsewhere), real estate loans, mortgages, notes, bills of exchange, drafts or other securities, negotiable, or non-negotiable, lawfully held and owned by it, in its own right absolutely, at the date of such incorporation of the New Bank, including interest items accrued to that date, all of an actual and guaranteed value at date of incorporation of the New Bank, equal to the amount of cash in lieu of which such other assets are to be substituted. And the cash

and other assets so to be turned over by the Lafayette Bank, the first party, must be $468,000.00 in excess of all its liabilities which the New Bank may agree to assume, and the amount of cash and other assets so to be turned over by the South Side Bank of St. Louis, the second party, must be $780,000.00 in excess of all its liabilities which the New Bank may agree to assume.

It will be noted that no reference is made in either of the foregoing provisions for the payment in of good will as consideration for the issuance of the stock.

Next we find that the parties provided committees to value the tangible assets to be transferred and for an arbitrator to act in case of dispute between the committees as to the valuation of the tangible assets to be received. Apparently, the thought uppermost in their minds was that only assets of a "gilt edged" and thoroughly acceptable character should be paid in for the stock. Special provisions were made to protect the petitioner against any loss which might occur in the acquisition of such assets.

Further, it was provided that:

If, at the date of the valuation of the assets of the respective Banks, preliminary to the incorporation of the New Bank, it appears that either Bank will not be able to turn over to the New Bank, in cash or other acceptable assets, the amount hereinbefore agreed to be put by it (the Lafayette Bank $468,000.00 and $100,000.00 Special Reserve Fund, and the South Side Bank of St. Louis $780,000.00 and $100,000.00 Special Reserve Fund), *then the other Bank may correspondingly reduce the payment to be made by it for account of capital stock*, surplus and undivided profits; that is to say, on the basis hereinbefore provided, *each party was to pay in, for capital stock, surplus and undivided profits, the sum of $156.00 per share for the shares subscribed for it*, and therefore if the amount in cash and other assets which can only be so contributed by either party be less than $156.00 per share, *the amount to be paid in per share by the other party shall be similarly reduced.* [Italics ours.]

Provision is then made in this language for the acquisition of such of the good will of the old banks as the petitioner desired:

From the date of the incorporation of the New Bank, and when it has been authorized by the Bank Commissioner to engage in business, the parties hereto agree to turn over to the New Bank the good-will of their banking businesses and the customers thereof, so far as the New Bank may desire them; and to enable the New Bank to become fully possessed of such good-will and forever afterwards to enjoy the same, the parties hereto agree that they will not, at any time thereafter, engage in any branch of the banking or safe-deposit business, except to liquidate their remaining assets and distribute them to their stockholders, and they agree to wind up their affairs and to procure a dissolution of their charters whenever their affairs have been wound up, and not later than five years from the incorporation of the New Bank.

In the next section of the agreement, we find these words:

Nor is any valuation to be placed on "good-will," "business" or "going value" of either Bank, nor on its books of account, card system, or stationery.

The Board has heretofore had occasion to consider whether a bank which was prohibited by banking laws from carrying good will on

its books as an asset would thereby be deprived of good will for invested capital purposes under the Revenue Acts, and we held that good will properly acquired, should be included in invested capital, regardless of the inhibition in the banking laws for its appearance on the books of the bank as an asset. *Merchants National Bank* v. *Commissioner*, 6 B. T. A. 1167. There was, however, in that proceeding no question of the manner of acquisition of the good will which is the issue in these proceedings.

Cases have also been before the Board where a mixed aggregate of tangible and intangible assets were acquired for capital stock and the Commissioner had applied a sufficient amount of the stock to equal the value of the tangible assets before considering any stock as having been issued for intangible assets on the theory that there was a presumption that the stock was first issued for the tangibles and that only the excess of the par value was applicable to good will. We held against such a presumption and permitted an allocation of the stock between the two classes of assets. *St. Louis Screw Co.*, 2 B. T. A. 649; *Mandel Brothers*, 4 B. T. A. 341. There was, however, a specific finding in each case that the stock was issued not only for tangibles, but also for intangibles.

A proceeding closely analogous to these proceedings was before the Board in *Charles Rubens & Co.*, 6 B. T. A. 626, wherein an allocation was denied as not coming within the principle of *St. Louis Screw Co.*, *supra*. There an individual owned a business whose assets consisted of tangibles and intangibles which were acquired by a new corporation which was formed. The agreement under which the assets were transferred provided that stock should be issued for the tangible assets and that the intangible assets should be conveyed for the nominal consideration of one dollar. Even the nominal consideration was not paid. There was evidence that there was good will possessed by the individual which he desired to transfer to the corporation and that the only consideration which flowed to the individual in the sale was the capital stock of the corporation. The Board was reminded there as here that contracts should be interpreted as a whole so as to give effect to each term. The Board, in denying petitioner's claim, said:

We are impelled, however, by a fair reading of the written evidence of the transaction, to decide against the petitioner in this respect. The express language of the offer, the resolution and the contract, as well as the certificate of subscription filed with the Secretary of State, are unequivocal and unambiguous and leave no room for construction. The parties themselves deliberately and with unmistakable clearness chose to have the tangible property alone paid in for capital stock and the intangible property separately treated. This was their manifest intention and it was legally fulfilled. The fact that a subsequent revenue law makes their choice less fortunate to them than it might otherwise have been and imposes upon the corporation a greater tax than if another course had been adopted, can not serve to justify an interpre-

tation of the transaction at variance with the clear language of the instruments by which it was performed. The argument that contracts should be interpreted as a whole and so as to give effect to each term is beside the point, for it is by thus reading the documents that we are led to the conclusion reached.

Likewise, see *Nature's Rival Co.*, 6 B. T. A. 294, wherein these statements appear:

From the evidence it is not possible to decide that the petitioner's invested capital should include any amount for the alleged good will or other intangible property. The statutory invested capital includes intangible property only when " paid in for stock or shares." The evidence clearly shows that the only property paid in for stock or shares at the time of organization was $10,000 cash and merchandise which was paid in for $10,000 of stock. This has been allowed in invested capital by respondent. The evidence is also clear that the intangible property acquired from the Arizona Company and the Form Company was turned in to the petitioner at the same time. It was of such a nature that apart from the business it was of no value and hence it would be idle to argue that it was withheld by the individuals until 1913. And the witnesses testified that it was not withheld but was at once turned in to the new company. This being so, such value as it had could only be a paid-in surplus. If so, it was not within the statute.

The Board is of the opinion that the principle decided in the two preceding cases is conclusive of the question here involved. Section 326, Revenue Act of 1918, recognizes intangibles as invested capital only when paid in for stock or shares. An examination of the entire agreement under which the good will came to the petitioner shows not only that the consideration for the issuance of stock was not good will, but also that every precaution was taken to keep it from being so considered. The parties provided with meticulous care exactly the character of assets which would be acceptable consideration for the stock of the petitioner, and good will was not among these assets. In a separate provision of the instrument, it is provided that, " From the date of the incorporation of the New Bank and when it has been authorized by the Bank Commissioner to engage in business," then such good will of the old banks as the petitioner desired was to be turned over. We fail to see how the agreement can leave any doubt that the stock was to be issued for tangibles alone and that the intangibles were to come to the petitioner under the terms of the agreement, but without consideration. Any allocation of stock to intangibles must, therefore, be denied.

Since the value of the tangibles was in excess of the capital stock issued, the only manner in which the value of the intangibles could find their way into invested capital would be as a paid-in surplus. The Board, however, has already held that a paid-in surplus can not be allowed on intangibles. *Herald-Despatch Co.*, 4 B. T. A. 1096.

Reviewed by the Board.

*Judgment will be entered for the respondent.*